22-5281, American Oversight Appellant v. United States Department of Health and Human Services and Office of Management and Budget, Ms. Morton for Appellant, Mr. Schultz for Appellees. Morning Ms. Morton, you may proceed when you're ready. Good morning Your Honors, and may it please the Court. Jessica Morton for Plaintiff Appellant, American Oversight. I've asked to reserve two minutes for rebuttal. In Klamath, the Supreme Court identified the contours of a typical consultant relationship which might fulfill the consultant corollary, one where the purported consultant acts just as an employee would be expected to do, and so can be fairly deemed part of the agency itself. The record in this case is replete with evidence that the members of Congress and their staff who communicate with HHS and OMB were not acting just as employees of those agencies. I turn to the Slimrod Declaration, Mr. Slimrod from OMB. At JA 109, he discusses negotiating legislative compromises. At JA 111, he discusses capitalizing on opportunities to influence the drafting process so it comports the administration policies. At JA 113, he mentions emails including discussions of, quote, sources of ongoing disagreement, end quote, between the administration and Congress, again at 113, providing technical assistance to Congress in drafting. At JA 115, he writes, and I quote, OMB sought to influence and shape pending legislation by discussing, consulting, and negotiating with congressional personnel regarding the details of legislative proposals and the legislative process. And at JA 116, he expresses concern about chilling OMB's negotiations with Congress. Can I ask you about EPA v. Mink? You don't think that Klamath overruled EPA v. Mink, do you? I beg your pardon, Your Honor? I'm sorry. You don't believe that the Klamath decision overruled the court's earlier decision in EPA v. Mink, do you? I don't believe so, Your Honor. So in EPA v. Mink, there was a task force group, don't know the specific title for it, that was created to advise the president with respect to nuclear testing that was planned. The court said that is not an agency with respect to FOIA. And so the question in the case was, well, were documents that were transmitted between the EPA, which is an agency under FOIA, and this group, which was not an agency under FOIA, are those either interagency or intraagency communications? And the court disposed of that argument very easily and said, obviously, they are. It didn't really matter that EPA, the agency, was communicating with a non-agency. That was, notwithstanding this consultant corollary doctrine, it was all seems to be part of the court's understanding that whatever this non-agency was doing, communicating with the agency, it was all part and parcel of actions that were part of the deliberations that were going to be advising the president. You think that's a fair characterization of the holding on that issue in EPA v. Mink? As I recall it, Your Honor. Given that, why isn't it in the rationale of EPA v. Mink was cited by us after Klamath in the Judicial Watch v. I think it's Department of Energy case in 2005, which also involved like a task force that was a non-agency that was sending documents back and forth with an agency. So, I guess what I'm saying is, even outside of this consultant corollary doctrine, there's been an understanding from the beginning of FOIA that the inter-agency, intra-agency test is not literal in that it can include within that set for Exemption 5 documents that go back and forth between an agency and a non-agency if they are part of the process of deliberations within the executive branch. I would cling on to that last point that you made, Your Honor, deliberations within the executive branch. It's my understanding that in both EPA v. Mink and Judicial Watch, these are bodies set up to advise the president within the judicial branch, that the courts found this to their holdings. Here, of course, Congress is not an advisory council to the president in the executive branch. Congress is a separate, co-equal branch of government. But the pushback I would have is that if the president wants to pass legislation, the president can draft all the legislation as much as he likes, but he has to get a member of Congress to introduce the legislation. He can't directly introduce the legislation. And likewise, the president needs to know what Congress will pass, and so that influences his deliberations as to what to propose in the deliberations. And Congress wants to know what the president might veto or not, so that they can decide what they're going to do, and in turn, they communicate essentially to get the advice of the president. But all of this is being done in context of advising the president about either what to do about legislation that's about to be introduced or what to do about legislation that has been introduced. Well, Your Honor, I certainly agree that both Congress and the president have interest in knowing what their co-branches are doing on these kinds of issues, but I would disagree when it comes to the idea that they're advising the president in the same way that the advisory council in traditional watch is advising the president. Because Congress, as you articulated, has its own interest in knowing what the president is going to do, its own interest in passing legislation, its own interest in what kind of bill is put forward. Of course, Congress certainly wants to know if the president is going to support the bill or not. But that's why this is really, as the document that I suggested, cited from Mr. Slingrod, shows a two-way street where there is advice being given both ways and it's egotistic. Is it fair to say that Congress is giving information to OMB or HHS that will be used to advise the president? Your Honor, it is certainly the case that Mr. Slingrod, in his declaration, said that some of the information received was being used by OMB to prepare recommendations as to whether the president should support a bill in his SAP, but it is also the case that Congress is receiving information from the executive branch, that OMB is providing technical assistance to Congress, and that this is not simply a case of the executive branch soliciting information from an advisory committee in a one-way street, the way an employee would be expected to do for its employer. This is a negotiation between co-equal branches, which is consistent with our separation of powers principles. What is the difference between the senators in Ryan v. Department of Justice and the members and their staffers in this case? Doesn't Ryan stand for the proposition that as long as the agency reaches out to legislators for advice or input, then the communications are intra-agency communications? Well, first of all, Your Honor, solicitation on its own can no longer stand after Klamath because there was solicitation there, which the court found is sufficient. Is it needed even if it's not sufficient? Necessary? I believe so, Your Honor. But Ryan is also distinguishable on its facts. In that case, the attorney general asked every senator, not just some as the case was here, to answer specific questions about the process that they were using to recommend nominees for federal district court judges. And this resulted in a one-way flow of largely factual and procedural information back. The questions in Ryan, which are available at 617-F2D-791, ask things like the demographics of the nominating committee, how they chose who to interview, how many people they interviewed. And there's no indication that the answers to those questions could reflect any sort of self-interest on the part of the respondents. That's quite different than the facts we have here, where there's a complex legislation on the table, and we see evidence in the record that the executive branch and the legislative branch are going back and forth and, quote, negotiating over what should be in these bills going forward. What I can understand in the big picture here is that Congress exempted itself from FOIA, right? Yes, Your Honor. So your position is that Congress, whose deliberations and communications aren't discoverable under FOIA, the minute that they communicate with the executive branch, they become discoverable under FOIA because we, unless we can say that their interests were completely aligned, or you would say that the alignment of interests is irrelevant? I'm trying to understand your position. I would say that the test from Klamath, articulated again in Pierre, is the test of whether or not the purported consultant is behaving just as an employee would be expected to do and has no interest of its own or anyone else. But to your textual point, Your Honor, it's certainly the case that Congress knew how to exempt itself from FOIA and chose not to exempt itself from the term – chose to exempt itself from the term agency and could have written Exemption 5 in a way that would protect its communications and chose not to. And this Court's precedent, the Supreme Court precedent, is clear that when Congress makes an intentional choice to exempt itself in one place but not elsewhere, we should give respect to that decision. So relatedly, I'm curious about this. There's not a lot of precedent on this, but there's a lot of interaction between the executive branch and Congress on legislation all the time. And so do you have a sense of whether agencies routinely withhold congressional communications from FOIA requests under Exemption 5, or are they typically not asked? Is this a new phenomenon? Like, why isn't there more of an established understanding on this? Or is there, and I'm just not aware of it? I don't have any metrics, Your Honor. I do know that I'm only familiar with four cases, all from district within this Court, that affirmatively address this issue of communications between Congress and the executive branch regarding legislation in a meaningful way. It's my understanding that the executive branch does sometimes not enforce Exemption 5 of these communications and sometimes will disclose documents. In this case, at J12526, we discussed documents that were not withheld in this case. In this case, mm-hmm. It's my understanding that in other cases as well, the executive branch has not always chosen to withhold those documents, but I'm not aware, Your Honor, of how frequently they're requested or how frequently the Department chooses one action over another. But doesn't, I guess Judge Pillard's question gets to a concern that I have, which quite frankly is, like, how is the legislative process, which already doesn't work so well, how is that supposed to work when the communications between the Congress and the executive branch would be in a fishbowl, if you're right? Well, first, Your Honor- How does that advance kind of our understanding of kind of the delicate balance that FOIA was intended to keep and maintain? As you point out, Your Honor, there is a delicate balance in FOIA between enabling agencies to make the best decisions possible through having expert, independent advice that is unbiased and providing transparency and sunshine to the public. And that's why in the typical consultant corollary case where you have this unbiased interest, it's appropriate to permit consultant communications to be withheld. But whenever, under the test in Klamath and Peer, you have self-interested outside purported consultants, that's when that policy interest becomes a bit diminished because it's no longer about a true interagency determination, but about outside consultants influencing that decision, and that's when sunshine and transparency become all the more important. I guess the reason that I have trouble feeling that, like, that's the only prism in which we should look at this is that, you know, in a lot of ways, this is like a settlement negotiation occurring between Congress and the President, and settlement negotiations are also, you know, confidential, and it doesn't, the parties that are settling don't have aligned interests. Normally their interests are absolutely conflicting. But when the first party says to the other party, you know, this is my offer, and if you don't take this offer, I'm going to beat you over the head with, you know, this evidence or see you in another case or whatever it is, they're advising the other side. It may be from their own interests, but it's advice that the other side is taking and they are using that to determine kind of what to do and whether to accept the offer or whether to make a counteroffer and what that should be. So I guess I'm not sure that I agree with the premise that just because it's a different branch and their interests may not perfectly be aligned, that it's still not akin to the same sort of interest that FOIA is trying to protect. What's your response to that way of looking at it? Two points, Your Honor. First, you know, that's, I appreciate the point that you're making, but that's simply not the test respectfully set out in PEER, which says that where an outside consultant does not have its own interest in mind is the moment when consultant corollary is appropriate. But my point is that the consultant corollary doctrine isn't the only way of looking at how to determine whether there's an interagency communication. Correct, Your Honor, but this Court in the wake of Klamath has interpreted the consultant corollary to be the appropriate mode of understanding whether a document is interagency or interagency under the text of FOIA Exemption 5. I also wanted to point out in response to your question, Your Honor, about the concerns of chilling interactions between the branches. In Klamath itself, the Supreme Court recognized that the declarations put forward clearly stated that there was a concern that communications would be chilled, and they credited those declarations and said, even if that's the case, that simply can't carry the day here. Let me ask you, Ms. Morton, at least some of these communications involved HHS or OMB soliciting specific updates on bill text or the status of bills from Congress. And I wonder whether we need to sort of separate out the various different communications here and analyze some of them per Ryan separately from the rest. If the executive is using the congressional members and staff in two different ways, on the one hand saying, we just need to know where this state of play is, and in that sense it's just information, versus a bunch of kind of negotiating back and forth where the Congress is. Should we sort of sift through the communications and hold that some are subject to the consultant corollary and some not? Well, Your Honor, you're certainly correct that there's a spectrum of types of communications and that the ones that are negotiations are the most problematic, but I would remind the government bears the burden of showing that the Exemption 5 does not apply and the consultant corollary does. And so we only have what's before us on this record here. I would also point out that in Ryan, as opposed to what we have here, the AG submitted the questionnaire to every senator, whereas here we only have communications with a small number of members of Congress and their staff. And it is very odd. I mean, it seems like the government's reasoning is that the interests are aligned, and they actually have two different versions of that. One is everybody takes an oath to uphold the Constitution, but the other is that they wanted the same thing on the health care bill. To the extent that it's the latter, it seems that the argument is that the consultant corollary applies here, but it wouldn't apply if the HHS or OMB personnel had reached out to people who were defending the existing health care law, people on the Hill who were defending the existing health care law. Is that how you understand it, or why isn't it enough that everybody takes the same oath of allegiance to the Constitution? That is how I understand the government's position, Judge Pillard. I think that's why it's difficult to apply, because it suggests that everyone shares a same goal at a very high level, but it's so attenuated as to be difficult to apply in context, because people may agree that they want to repeal and replace the Affordable Care Act, but disagree about how to actually do so or how to implement it, or they may agree on the broad brushstrokes but have very different views on what particular provision should be included or not if one has a particular interest to their constituents. Party lines are not a clear or easy way to draw this. There's a statement in the record and in the crew brief at 11 from Republican Congressman Whitman who said that he opposed the bill because of, quote, the best interests of Virginians, thinking about his constituents. That's in the record at docket 30-3 at 97. I have a question about this, because when there were cross-motions for summary judgment and one of the facts that the government said was undisputed was that HHS and members of Congress and their staff who exchanged the emails at issue in this case shared a common interest in enacting health care reform legislation. That was their statement of fact number 15, and they had a declaration from Scrisaki as evidence of that. Your client denied that but did not cite any evidence in the denial, just said, see our points of authority under our district court's local rule. That's not sufficient to counter a statement of fact in a summary judgment motion. The district court found that there was a common interest. That's in the memorandum of opinion. Don't we review that for clear error? Can't we say that really it's kind of like too little too late for you to dispute that fact now when you didn't properly dispute it in the district court? A few points in response, Your Honor. First of all, at the summary judgment standard with Genova review, I'm not sure I would qualify this as a factual finding, because at summary judgment, a district court should be not making specific factual findings, but instead treating the facts in the light most favorable to the party opposing the district court. The district court has to determine whether a fact is in dispute to know whether it can decide the case or whether it needs to have a trial or some sort of a hearing to make a finding on a disputed fact. That's why you file your statement of facts which you contend aren't in dispute so that the district court can sort it out and see, can I decide this case on summary judgment or not? Your Honor, even accepting the statement that the members of Congress who were communicating with the executive branch and those executive branch agencies shared an interest in health care reform, that still doesn't allow for an administrable rule going forward because of the complex details of legislation as evidenced by the points of disagreement and negotiations that are shown in the record. I also wanted to address in response to both that question and Judge Plourd's question that the real question in Klamath is not necessarily the identity between the purported consultant and the agency, but whether there is a lack of identity of interest between the purported consultant and their compatriot. So in Klamath, there's a lack of identity of interest between the tribes and other claimants to water. And so too here, the members of Congress with whom OMB and HHS consulted may share their interest in overturning the Affordable Care Act, but there are other members of Congress who do not share that interest. And they are not able to get into the bill the provisions that they want to have necessarily or that they are hoping that the bill is vetoed while the members of Congress who are working with the agencies hope that it is signed. And it's that difference that is material. Your Honor, I'm sorry. I apologize. I just want to clarify what exactly you think the test is. I understood you earlier to be saying that we should basically adopt as a rule what Klamath described as the typical case. And so whether there is a common interest at whatever level of generality is irrelevant under your view. Is that right? I believe that this Court should adopt the test in Klamath and articulate it in Peer, which is that the consultant corollary is confined to situations where an outside consultant did not have its own interest in mind and is still behaving just as an employee would be expected to do. I realize I'm far over time, but with the Court's indulgence, I would like to speak to the adequacy of the search unless the Court would prefer that I not. I just had one question about that. Why isn't it enough that HHS states that any potentially responsive records, whether they contain one or more of these search terms? That's from the Bell Declaration, Paragraph 17. Yes, Your Honor. So of course the declarations are afforded a presumption of good faith, but that doesn't mean that they are infallible. And if you turn to the page before, to A122 at Paragraph 16, Mr. Bell describes that they search only the terms that were frequently used as opposed to more general terms. And so the declaration doesn't speak to whether terms he requested, such as Obamacare, which are commonly used synonyms for the Affordable Care Act, would have produced additional documents. The standard in this Court is that the agency has to demonstrate beyond material doubt it has undertaken a search reasonably calculated to uncover all relevant documents. The declaration doesn't do that, but even more than that, here we put forward evidence in the record that leaders in HHS and Congress were using the term Obamacare. So at JA 470, there's a document produced by HHS in which the Senate Finance Committee describes Senator Orrin Hatch's position on Obamacare. At JA 476 is a quote from HHS to the press that manages to use Obamacare three times in two sentences. There are several sites in the record to transcripts from television segments at 358, 69, 415, 428, and 429 where Secretary Tom Price is using the term. And so that — But did any of those citations of instances, they used Obamacare, but they did not use one of the search terms? Well, Your Honor, as to the documents produced by HHS, it would be impossible for us to have any documents that did not include the search terms that were already used. Your Honor, I'm sorry. You — I might have misheard you, but I thought you said that Obamacare was one of your requested search terms? I apologize. It was a search term that we request that HHS would include. We did not provide HHS with requested search terms in our original FOIA request. Can you clarify when you asked them to include that term? It was in negotiations that I believe were in the spring of 2017. Before they prepared these declarations? I would have to confirm the exact timeline, Your Honor. While the case was pending in the district court? I believe so. Does the court have any — Thank you, Your Honor. We'll give you a couple of minutes for rebuttal. Thank you, Your Honor. Good morning, Mr. Schultz. Good morning, Your Honor. May it please the Court, Benjamin Schultz, on behalf of the government. I'll start with the consultant corollary. And I think my colleague's colloquy with Judge Garcia really encapsulates the problem with this case, which is that the position they want this Court to adopt, that a consultant can never be self-interested, is a position that this Court has already rejected in its case law. And in Klamath, the Supreme Court specifically acknowledged that. It had a footnote where it talked about this Court's opinion in Ryan and this Court's in Public Citizen. The Supreme Court said that the consultants in those cases would be expected to have strong interests of their own, and the Supreme Court said it was not overruling those cases. This Court, post-Klamath — It said it had no occasion to determine whether to overrule. That's right. I mean, we're not saying that, you know, there might be some future case where we get more guidance from the Supreme Court about what the consultant corollary is. But certainly, Klamath on its own did not overrule those cases, and they remain the binding case law of this circuit. And not only do we know that from Klamath, but we also know it because after Klamath, this Court made exactly that point. And in the NIMJ case — Counsel, in NIMJ, I agree at one point it does say something to that effect. Then later, it explicitly carves out this question again and notes that the entity at issue in that case did not have its own interests in mind. And then we make exactly the same statement in Peer and in our other cases since then. So I think Your Honor is right that there has not been a post-Klamath case that this Court then said the consultant was self-interested and we are applying the consultant corollary anyway. But what we — Go ahead. I didn't mean to interrupt you. We're here to hear from you. Sure. But I think we do know that Ryan and Public Citizen are cases where the consultant was self-interested, and those remain binding case law in this Court. But I actually think that's a little bit of a sort of blurring over the distinction. In Ryan, the presidents probably had strong feelings, but the information that they were being asked and the interaction was not one that was affected by those feelings. They were asking for, you know, pretty straightforward information. And indeed, in NIMJ, we said that the Court in Klamath explained the fact about the consultant — this is on page 682 — the fact about the consultant that is constant in the typical cases is the consultant does not represent an interest of its own or the interest of any other client when it advises the agency that hires it. So the nuclear, you know, scientists in Mink, clearly they have views, but they're being asked to provide a certain defined kind of information, whereas what feels much more Klamath-like, frankly, about this case is there, and even stronger against the application of the consultant corollary, frankly, is there — even though the United States was a fiduciary for the tribe, you know, had a structurally very aligned interest, the fact that the tribe was in contention with other players, so Page 622 here, the Congress members are actively in their role as representatives of their members when they are providing information to and in dialogue with the executive. And there are other members who are not privy to those conversations who have divergent, different interests, just like the other claimants for water. So there's a lot going on — I'm sorry — Yeah, yeah. There's a lot going on in that question, and I want to unpack various pieces of it. Right. So let me start with the first piece of that, which is Your Honor's description of the Ryan case. I actually think that while some of the questions in that questionnaire in Ryan were kind of humdrum, factual questions, those were the questions that this Court in Ryan thought weren't covered by the deliberative process privilege at all. What the Court drew a distinction in in Ryan was those kind of factual questions, and then other questions that were likely to give information about how the Senators were actually developing their recommendations and why they were recommending particular kinds of candidates as opposed to other kinds of candidates. And as to that part of it, I think it's very clear that you would expect the Senators to have strong personal interests, that different Senators are likely to approach that different ways. Some of them might be aligned with the executive branch in that regard, and some of them might not be. And I think that's part of why, when the Supreme Court described the Ryan case in that footnote in Klamath, the Supreme Court didn't think it was hard to see that case as one in which the Senators would have strong interests. And I think the fact that in Ryan you had a wide swath of Senators, Senators who might be aligned with the Administration and Senators who might not be aligned with the Administration, would be a harder case than this one, where here, as Your Honors have pointed out, we have declarations that talk about how the consultations with the members of Congress and their staff were consultations with people that at least the Administration thought was aligned with them. So kind of that's just one box that I want to talk about. Now, another thing that Your Honor said that I want to really push back on is how Your Honor is conceiving of the interests of the legislators. And I think it might be tempting in a case like this to look at interests in a really broad view and say, you know, boy, like, the question here was about what statute Congress should pass. And that's part of what was going on here. But if you look at the actual deliberations that are at issue, that's not all that was going on here. So, for example, some of the consultations that are at issue in this case are situations where OMB is talking to members of Congress about statements of Administration policy. And so these are things that, these are statements that the President makes at the Administration issues and they say, here's what we think about pending legislation and it's designed to achieve various results in Congress. And so some of the consultations were the Executive Branch going to members of Congress and their staff saying, okay, here's one way we could draft this statement of Administration policy. What do you think about this proposal versus what do you think if we release it at this point in the legislative process versus what do you think about if we release it at another point in the legislative process? And I think when you think about, you know, the interests on that more microcosmic level, then it's hard to see this really as a situation where the interests of legislators are necessarily adverse to others. Indeed, whenever you have a legislative process, it's so multidimensional. There are so many different things that can happen in a legislative process that at a I also want to talk about the fact that, you know, some of the consultations at issue here are also just about presidential decision making. And part of presidential decision making is about trying to understand what legislators are getting at. So, for example, you know, one of the categories of documents at issue in this case is there's draft legislative language. And some of the consultations are things like trying to figure out what a particular legislator is getting at. Like, what are you trying to do with this draft legislation? Are you trying to get to this policy outcome or are you trying to get to that policy outcome? And again, these kinds of consultations are not ones that you look at and you say, okay, these have to be things where, you know, the interests are necessarily adverse to competitors. So I think all of this is to say that, you know, maybe the individual legislators have interests in the sense that, you know, they have strong personal views. But that's not the kind of interest that's disqualifying. I'm really struck by that, like, what, do you know what the norms are? Do members and people within the executive typically have these strategy sessions that are sort of maybe intermingled with more, you know, here's where we stand and here's what we think about more kind of reporting on information that only the members could provide? Like, and has it been the assumption that this is all confidential under Exemption 5 or has it been the assumption that it's not? Or I'm just surprised that this is coming up now. So I don't know that I have much to offer about sort of a broad, long-term understanding. I can tell you what's in the record in this case. And both the HHS declaration and the OMB declaration talk about the expectation from the people in those agencies that these would be confidential communications. And they thought that their counterparts in Congress that they were communicating with shared that expectation. But these are relative newcomers. They may know nothing about how this is usually done. Your Honor, the declarations don't say whether this was their first stint in government, whether they had been in government in the past. So I agree that it only tells you so much to answer Your Honor's question. What's your view on the issue of the district court finding that there was a common interest in what import that finding should have and how we should review that finding, if at all, what standard we should use to review it? Sure. I mean, I think if you talk about, by common interest, you mean that they were not, they didn't have adverse interests in the Klamath sense. You know, I think the basic standard would be the summary judgment standard. And so this court would review summary judgment de novo. Your Honor is right that to the extent that the evidence might have shown, theoretically that the record might have shown that there was a disputed material issue of fact, that, of course, the various procedural rules for how a party is supposed to present that argument to the district court would certainly apply. And so, you know, if somebody's evidence showed a disputed material fact and then for whatever reason they didn't adequately call that to the district court's attention, we would agree that that would change the standard of review. The court wouldn't just look at the underlying evidence, ignoring that procedural backdrop. Counsel, can we go back to what, I'm struggling, I'd just like to hear what you would say is the rule that we're applying. I think in your brief at some points you suggested sort of the broad Ryan articulation, essentially anything that's deliberative, and that sometimes today and in your brief you also use the facts of Klamath as whether the outside entity not only has a self-interest but is somehow adverse to other competitors. Is it the latter that you're advancing? So I think the test for whether the consultant corollary applies, I would articulate as a two-step test. The basic test is the test that appears in this Court's case law, which is the Court looks at whether the documents are part of the agency's deliberative process. The second part of the test is we know from Klamath that there is at least one exception to that rule, the Klamath exception, which is if you have the putative consultant as an entity who has their own self-interest and they're necessarily adverse to competitors competing over a limited pool of resources that are necessarily inadequate to satisfy everyone, we know that the consultant corollary cannot apply in that situation. So I think... If we use that as the test, right? One thing Klamath says very clearly is that we need to give some intelligible meaning to the words intra-agency. So it can't just be step one. Correct. And so on step two, how would you explain how that test relates to whether something should be deemed intra-agency? And I'll just say, whether they act like an employee in the sense that they don't have an interest in the outcome seems a very straightforward way to think of someone as intra-agency or not. You're acting as if you're an HHS employee or personnel who don't understand the connection of this adverse interest test. Sure. Let me start by kind of exploring just how I think the interest is a bit of a red herring here. And so if you just think about what it means for a document to be intra-agency, to use the example of the Department of Justice, there are plenty of deliberations within the Department of Justice, say what position to take in litigation, where there are parts of the Department of Justice that have very different interests. Some parts of the Department of Justice are charged with affirmatively enforcing certain kinds of statutes, and they take a very pro-enforcement view. Other parts of the Department of Justice are more defensively minded, and they take a very defensive-minded view. And so in the process of determining what the Department's litigating position would be, you might find very strong, very divergent views from components that have very different interests. But nonetheless, the underlying interest here is one of acting in support of the American people, of furthering the government's mission. And I think that's... Can you just explain why the test can't be whether the people communicating have adverse interests? Sure. I think if you think about what it means to be intra-agency, my point is there can be parts of an agency where different parts of an agency have very strong and very divergent interests, but we've never thought of interest in that narrow sense. We thought, and I think when Congress used the term intra-agency, it could not have been thinking of interest in that narrow sense. And same thing with inter-agency. You have situations where you could even have one agency suing another agency in litigation. As this Court well knows, it sees some of those cases. But again, I don't think I hear the other side saying that those aren't inter-agency documents. And so that's why I think just looking at this interest is such a red herring. But I thought that Judge Garcia was saying that the bigger umbrella, or the more significant test, is whether the putative consultant is acting in a role akin to that of an employee of the agency, and that the interest is part of exploring that. And so I guess if we were to accept your view, I'm not sure what would distinguish an industry sector that was interested in a particular piece of legislation, and OMB and HHS are thinking, you know, let's say it's pharmaceuticals, well, it's going to make a big difference to various key legislators whether this sector supports this legislation, and we've seen their template legislation, what do they mean by A, B, or C, maybe we could tweak that. And if that relationship renders that sector to be a consultant, I think we've very substantially broadened the applicability of the inter-agency deliberative process exemption. So I don't think the Court needs to go there to decide this case, and there are a couple of ways that it can avoid that outcome. One is, we've explained that at least when you're talking about inter-branch communications, whether it's with Congress or with the judicial branch, those are in a unique category because the oath of office that these people... I don't know. I mean, I'm just saying that it feels like the different branch under the Constitution has a live, dynamic, and irrefutable interest in acting in not as the agent of another branch. So respectfully, Your Honor, if that were the logic, it's hard to see how Ryan could have come out the way that it did. I think there are plenty of situations, and Ryan is one of them, in which when you have these inter-branch consultations, the executive branch is asking a question. Another branch has particular expertise, and they're sharing that expertise, just as happened in Ryan. And sure, it may be the case that that branch also has its own interest, but in Ryan it certainly wasn't disqualifying that you also had your own interests. And indeed, public citizen, if anything, goes even farther because those were private entities. Those were former presidents who were not currently in government, and they clearly had their own strong interests. And nonetheless, this court in public citizen concluded that they were still operating in that consultant path. Well, let's just... Yeah, go ahead. Could I just go back to the internal DOJ deliberations? Because it does actually, hopefully, maybe clarify where the question is coming from. What Klamath says is that you can have a point of view. Of course, you can have different points of view. What you can't have is different interests in the outcome. Another way of saying that would be you can have a view, but you can't have a stake. If one of those employees in the DOJ, in the civil division, is related to one of the parties, they can't be in that room. And in that sense, they are not like an employee. The analogy here would be that Congress, especially in a case like this, where there's a negotiation and a give and take, even if they were perfectly aligned in terms of the interests, Congress has an independent stake because they're always representing their constituents. So I want to push back on that on two different dimensions. First of all, I actually think your example is a great one because if somebody, for example, violated the ethics rules within DOJ and worked on a case where they had a personal interest, there might be consequences for them as an attorney. But I don't think it would deprive the communication of its intra-agency character. In the same way, if, for example, an attorney sought ethics advice from someone within DOJ and they said, hey, I may have a personal interest in this case, but it might also be a waivable personal interest, and they consulted with ethics people about whether or not they could waive that interest, the fact that they might have had a personal interest, again, it wouldn't disqualify it from being an intra-agency communication. My point, obviously anything that happens within an agency is intra-agency. I think my point is that if the test were, are you functioning like an employee, the way you know whether you're like an employee or not is whether you only have the interest in giving good advice or if you somehow have a stake in the outcome. So I want to push back on that part of it as well. Part of why I don't think that's quite the right articulation of the test is because we know from Klamath that whatever the court in Klamath thought was the typical situation where you had a consultant corollary, and maybe what Your Honor is describing is, you know, the typical situation, Klamath also acknowledged that you have the Ryan-type situation and you have the public citizen situation. But I took that to be a much more raising a question mark about their continued vitality because what the Supreme Court said was these two cases arguably extend beyond what we have characterized as the typical examples of the consultant relationship, and I guess you're reading that as they extend beyond and therefore the typical model, the consultant corollary is not limited to the typical, but another way of reading it is we're the Supreme Court, we're not sure that what the D.C. Circuit has done is within the confines of the rule we're laying out here today, so D.C. Circuit heed that going forward. And to the extent that that's the reading of that footnote, then I don't think we can lean too hard on Ryan and public citizen. Well, respectfully, Your Honor, I think this argument might look a little bit different if it were an argument in the Supreme Court, but here we have all of this court's existing precedent. We have Ryan, we have public citizen, and they are the binding precedent of this court. We know that Klamath did not overrule them. We know that this court has since Klamath acknowledged that Klamath did not overrule them. And so I think for our purposes, Ryan is good law, public citizen is good law, and it's not the correct reading of the consultant corollary to say that you have to have no interest. Thank you. The test the government suggests, the necessarily adverse test, is not inconsistent with Klamath, but is not required by it or this court's precedent either. Indeed, I'm not aware of any court of appeals that has reduced Klamath to its most narrow fact-bound holding. Our formulation is wholly consistent with this court's discussion of its past precedent in Peer, and it's also consistent with Ryan and public citizen. As to public citizen, that case itself stated there may be some point where features of other relationships might eclipse the consultative relationship, and that was when public citizen said, we're not there yet. This is at 111, F3rd at 171. I would submit that we are now beyond those facts of Ryan and public citizen, and that the government is seeking to broaden this atextual consultant corollary against a backdrop of cases where the Supreme Court recently in Milner and Argus Leader have rejected atextual glosses on Exemptions 2 and Exemption 4. The court makes the point that agencies can have diverse interests, and that certainly is true. They can have views within the agency, but that's part of the deliberative process and doesn't raise the textual concern that our case does, because those are still purely intra-agency on the face of the text. My colleague is correct that legislation is multidimensional, and because it is multidimensional, there are multiple factors of stakes that members of Congress have whenever they are negotiating what should go into a bill, whether to vote for a bill, and whether they hope the president will endorse it or sign it or not. And because of those divergent interests, the consultant corollary is inappropriate in this case. Unless the court has further questions, we ask the court to reverse. Thank you. The case is admitted. Thank you both for very able arguments.
judges: Pillard, Wilkins, Garcia